UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION



******************************************************
                                  *
FIRST DAKOTA NATIONAL BANK,       *       CIV. 08-4167
                                  *
         Plaintiff,               *
                                  *
                                  *       MEMORANDUM OPINION
   -vs-                           *       AND ORDER DENYING MOTION
                                  *       FOR SUMMARY JUDGMENT
FIRST NATIONAL BANK OF            *
PLAINVIEW,                        *
                                  *
         Defendant.    .          *
                                  *
******************************************************

Defendant First National Bank of Plainview ("Plainview") has moved for summary judgment on Plaintiff First Dakota National Bank's ("First Dakota") claims. For the reasons stated below, the motion for summary judgment will be denied.

## BACKGROUND

First Dakota and Plainview are nationally chartered banks. From approximately 2002 to approximately 2006, Thomas Meyer ("Meyer") operated a lamb and cattle feeding operation in Minnehaha County, South Dakota. During this time, Meyer had a banking relationship with Plainview. Meyer maintained a general checking account at Plainview and also had loans. Plainview's loans to Meyer were secured by, among other things, a first mortgage on his feedlot in Minnehaha County and a blanket security in his personal property. In or around 2002, First Dakota started making loans to some of its customers who would in turn give Meyer the money to purchase sheep in exchange for a guaranteed profit of $2.00 per head when the sheep were sold for slaughter. When the sheep reached a certain weight, Myer would sell the sheep and pay the investors.

First Dakota or its customers could have obtained signatures from Meyer authorizing the filing of a UCC-1 Financing Statement, an Effective Financing Statement ("EFS") and a caretaker

financing statement against Meyer, but they did not do so.[1] First Dakota contends it was led to believe it did not need to obtain such filings because Plainview officials stated they claimed no interest in livestock at Meyer's feedlot. Initially, First Dakota would obtain signed acknowledgment forms from Plainview. Those forms identified First Dakota's customers to Plainview, identified the type of livestock and the number of head. Some of the forms noted the group number, the pen number, the weight, market price and other details. All of the forms provided:

> First Dakota National Bank, based upon loans to the above borrowers, will maintain a first and paramount security interest in and to the livestock owned by borrowers placed with your customer. After reviewing the report please indicate your acknowledgment and consent by signing this report where indicated.

First Dakota stopped requesting signed acknowledgments when Plainview said it did not need to do so because Plainview claimed no interest in the livestock on Meyer's feedlot.

The way that Meyer did business, without any financing statements of any type filed against him, allowed him to get better contractual terms from the slaughterhouses and, in turn, to pay higher profits to customers who invested with him. This process was the common practice among First Dakota, Plainview, Meyer and Meyer's investors for many years before the September 2005 through January 2006 time frame that is highlighted in First Dakota's Complaint. Meyer would sell First Dakota customers' lambs in his own name, deposit the funds in his Plainview checking account, and use proceeds from the sales to cover bills and other debts. Meyer's investors were paid by Meyer writing checks on his Plainview checking account usually made jointly payable to First Dakota and the appropriate First Dakota customer.

During the September 2005 through January 2006 time frame, and before, Plainview allowed Meyer to operate his account in a negative position at various times. Consistent with the UCC, when a check is presented for payment, Plainview has until the midnight deadline the following day to

---

[1]. Filing an EFS would have put the livestock buyers on notice that when the livestock were sold, the buyers needed to include First Dakota's or the customer's name on the check as a payee.

2

decide whether to honor the check and generate a true overdraft balance. Thus, when Plainview would receive a check from Meyer it had a day to decide whether to honor the check and create an overdraft or return the check for insufficient funds. When Meyer would write a check that would place his account in a negative position, Plainview would wait until the next day to see whether checks would show up for deposit sufficient to offset the checks that had placed the account in a negative balance position. Plainview would do so because Meyer would often fax to the bank a list of checks that would be arriving for deposit the next day, allowing Plainview to satisfy itself that the balance would again be positive the next day.

Meyer's feedlot operation failed in early 2006, and he left certain customers of First Dakota unpaid. Three of Meyer's investors that were First Dakota customers, the Fruits, Schartzs and Hartmans, sued First Dakota to cancel their debts to First Dakota and also to recover their lost equity in the Meyer operation. First Dakota settled with its customers.

First Dakota brought this action against Plainview, asserting that Plainview is responsible for some of the loss because from September 2005 to January 2006, Meyer was covering his large and constantly negative account balance at Plainview with proceeds from the sale of First Dakota's customer lambs, and Plainview knew it. In the Complaint, First Dakota alleges the following causes of action: (1) conversion; (2) breach of contract, and (3) unjust enrichment/estoppel.

Plainview argues it is entitled to summary judgment on First Dakota's claims because it had no legal duty to monitor Meyer's general checking account, and because First Dakota or its customers could have protected themselves by appropriate filings or other business arrangements with Meyer.

## DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

3

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987). These inferences, however, must be "reasonable inferences - - those that can be drawn from the evidence without resort to speculation. *P.H. v. Sch. Dist. of Kansas City*, 265 F.3d 653, 658 (8th Cir. 2001) (quoting *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1110 (8th Cir. 2001)). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "Only disputes over facts that might affect the outcome of the suit ... will properly preclude the entry of summary judgment." *P.H. v. Sch. Dist. Of Kansas City*, 265 F.3d at 658 (quoting *Anderson*, 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Bass v. SBC Commc'ns. Inc.*, 418 F.3d 870, 873 (8th Cir.2005) (quoting *Anderson*, 477 U.S. at 252.

Once the moving party has met its burden, the non-moving party may not rest on the allegations of its pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 257; *City of Mt. Pleasant v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 273-74 (8th Cir. 1988). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

First Dakota's theory behind all three causes of action asserted in its Complaint boils down to its argument that it had an equitable ownership interest in the deposits in Meyer's account. Under First Dakota's theory, this equitable ownership interest arose because Plainview knew that Meyer's

4

account was used for business transactions with the investors such as the Hartmans, Fruits and Schartzs, knew that Meyer used the proceeds from the sale of the investors' lambs for his overhead or ongoing business expenses, knew that Meyer owed money to the investors, and knew that Meyer's business was failing and started closely monitoring his account in August of 2005. Plainview requested and received balance sheets showing substantial unpaid accounts payable to the Hartmans, Fruits and Schartzs. First Dakota also relies on the fact that Plainview told First Dakota and Meyer that it claimed no interest in the livestock at Meyer's facility and, therefore, First Dakota no longer needed to obtain acknowledgments from Plainview.

As a general rule, the relationship between a bank and its depositors is one of creditor and debtor. The bank has a common law right of setoff; it can apply deposits belonging to the depositor to the pre-existing indebtedness of the depositor. *See, e.g., Calmenson Clothing Co. v. First Nat'l Bank and Trust Co.*, 258 N.W. 555, 557 (S.D. 1935) ("A bank to which a depositor owes a matured debt may set off or apply his general deposit to the discharge of such debt, and this right, at least with respect to a matured indebtedness, is not dependent upon the consent of the depositor.").

An exception to this rule exists when a bank has either actual or constructive notice or knowledge that a third party has an interest in the funds deposited in the account in question. *See, e.g., Shotwell v. Sioux Falls Savings Bank*, 147 N.W. 288 (S.D. 1914). In *Shotwell*, the defendant bank applied funds held by the plaintiff to the plaintiff's overdraft with the bank. The plaintiff, a grain elevator operator, had received the money from the sale of a third party's grain. The South Dakota Supreme Court noted a bank's right to offset funds "to secure overdrafts and debts owing," but held that anyone depositing funds belonging to a third person in his or her own name, holds those funds in trust. *Id.* at 290-91. Accordingly, the court held that a "bank had no right, legally or equitably, to be paid out of this or any other fund not belonging to [the owner of the account.]" *Id.* at 291. *Shotwell* further held that a bank is not "put upon inquiry to ascertain the true ownership of a fund of such character, where there is nothing to fairly give notice of the source from which the fund was received, or that the fund does not belong to the depositor or payer[.]" *Id.* at 290.

5

In *Meyer v. Norwest Bank Iowa*, 924 F.Supp. 964 (D.S.D. 1996), a livestock sales barn sued Norwest for conversion based on the bank's dishonor of two checks to the sales barn written by a feedlot that maintained accounts at Norwest. Norwest did not honor the checks because it had closed the feedlot's account when it became concerned about the sufficiency of the feedlot's collateral to cover its debt with Norwest. A jury found Norwest had converted the funds and awarded the plaintiff $216,518.30. This Court denied Norwest's motion for judgment as a matter of law, finding there was sufficient evidence that Norwest knew enough about its depositor's business and how the depositor operated on a float and with advances on payments to put the bank on notice of its duty to inquire into the possible trust nature of the deposit and the deposit's true ownership before it could setoff the deposit. The Eighth Circuit reversed, finding that Norwest did not have knowledge of specific transactions and its general knowledge that the account was used for the feedlot's business transactions was not enough to limit the bank's ability to setoff the deposit. *Meyer v. Norwest Bank Iowa*, 112 F.3d 946 (8th Cir. 1997). The Eighth Circuit reaffirmed, however, that "[a]ctual knowledge that funds belong to a third party can limit a bank's ability to setoff funds in good faith." *Id.* at 952. *See also American Nat'l Bank of St. Paul v. Nat'l Indemnity Co. of Omaha*, 222 F.2d 513, 519 (8th Cir. 1955) ("A bank having express . . . or implied knowledge that an agent or trustee is depositing trust funds in an account in its own name possesses no equities superior to those of the true owner of the trust funds.")

A review of the record in the present case reveals that Plainview had more knowledge about the funds in Meyer's account than Norwest had about the funds in the feedlot's account in the *Meyer* case. The Court finds that there are material questions of fact regarding Plainview's knowledge, and First Dakota is entitled to present the evidence in support of its conversion and unjust enrichment claims[2] at trial. *See, e.g., General Electric Capital Corp. v. Union Planters Bank, N.A.*, 409 F.3d 1049 (8th Cir. 2005) (questions of fact regarding the bank's knowledge of its depositor's business

---

[2]First Dakota admits it does not have an express contract with Plainview and indicates that its breach of contract claim is based on an implied contract with Plainview. The Court finds that First Dakota's breach of contract claim is subsumed by its unjust enrichment claim wherein it asks the Court to imply a contract in order to prevent Plainview from being unjustly enriched.

existed when bank started taking a more active role in the depositor's business, requiring it to justify expenses and "sweeping" a larger percentage of deposited funds). The parties' briefs indicate they agree on the elements of conversion and unjust enrichment claims under South Dakota law. At trial, the parties should focus on the knowledge Plainview officers and employees had regarding Meyer's operation, the deposits in his account, possible ownership interests in the proceeds deposited, and any other evidence relevant to determining First Dakota's interest in the proceeds of Meyer's account and Plainview's notice of First Dakota's interest in the proceeds.

The Court rejects Plainview's argument that First Dakota should be judicially estopped from prevailing in this case because of successful arguments it made in *Clif-Tex Land & Livestock, Inc. v. First Dakota Nat'l Bank*, 2008 WL 2930203 (Neb. App. Ct. 2008). Plainview's knowledge of First Dakota's interest in the funds in this case differs from First Dakota's lack of knowledge of Clif-Tex's interest in the funds at issue in that case. *Id.* ("First Dakota had no facts sufficient to put it on inquiry as to any special ownership of the funds and therefore had no duty to see that the proceeds of the deposits were paid to [Clif-Tex].") Accordingly,

IT IS ORDERED that Defendant's Motion for Summary Judgment, doc. 18, is denied.

Dated this 22nd day of June, 2010.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK
BY: _____
(SEAL)    DEPUTY

7