FILED

SEP 19 2011

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| FIRST DAKOTA NATIONAL BANK, Plaintiff, | * | CIV. 08-4167 |
| -vs- | * | MEMORANDUM OPINION AND ORDER |
| FIRST NATIONAL BANK OF PLAINVIEW, Defendant. | * | |

Plaintiff First Dakota National Bank ("First Dakota") brought this action against Defendant First National Bank of Plainview ("Plainview"), alleging counts for conversion, breach of contract and unjust enrichment. The action arises out of a lamb and cattle feeding operation owned by Thomas Meyer ("Meyer"). Several First Dakota customers had Meyer feed and finish livestock in which First Dakota maintained a security interest. Meyer had a checking account with Plainview into which he deposited proceeds from the sale of sheep and cattle, including those owned by First Dakota's customers. First Dakota expected to have first priority in any livestock or proceeds from the sale of its customers' livestock being fed at Meyer's feedlot. In late 2005, Meyer ceased operating his feedlot and First Dakota's customers lost money. Later, First Dakota discovered that Plainview approved repeated and extensive overdrafts on Meyer's checking account and would use livestock proceeds to pay down Meyer's overdrafts and negative balances. First Dakota filed suit against Plainview in state court, and Plainview removed the case to this Court based on diversity jurisdiction.

A court trial was held on the conversion and unjust enrichment claims on June 29 and 30, 2010. The parties submitted post-trial briefs and proposed findings of fact and conclusions of law. Additional briefing was ordered regarding a potential conflict of law issue. The following are the Court's findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plainview is a nationally chartered bank located in Plainview, Minnesota. First Dakota is a nationally chartered bank with its principal place of business in Yankton, South Dakota.

2. From approximately 2002 to approximately 2006, Meyer operated a lamb and cattle feeding operation in Minnehaha County, South Dakota.

3. During this time, Meyer maintained an interest-bearing deposit account at Plainview.

4. Jeremy Grady is a Vice President and Manager of the Salem Branch of First Dakota. His primary responsibility was for ag lending.

5. In or around 2001, Grady visited Meyer's feedlot in Minnehaha County, South Dakota in part to investigate whether the bank could get some business from people who were having livestock fed at Meyer's feedlot.

6. In or around 2002, First Dakota began operating an informal program where its customers would invest in Meyer's operation. The investment involved First Dakota loaning funds to its customers, who would in turn, through First Dakota, give Meyer the money to purchase sheep in exchange for a "guaranteed" profit of two dollars per head, but no more than that, when the sheep were sold for slaughter. In this sense, the investment was like a loan because the main risk was Meyer's solvency – not the health of the lambs or the market.

7. The reason the "investment" funds were funneled through First Dakota's customers this way -- rather than loaned to Meyer directly -- was that Meyer did not have the financial ability or credit rating to borrow that much money directly.

8. When the sheep reached a certain weight, Meyer would sell the sheep and pay back to the investors their original investment, plus an additional guaranteed two dollars per head.

9. None of the investors dealt with the day-to-day care or decision making regarding the financed livestock. Tom Meyer made all of the decisions and cared for the livestock. Meyer also decided when and to whom the sheep would be sold.

10. Jeremy Grady managed the financial side of the arrangement for the First Dakota customers. He acted as a middle man in communicating with Tom Meyer regarding the purchase of sheep in the names of First Dakota's customers, performed feedlot inspections, kept ledgers for each pen of sheep financed by First Dakota's customers, received bills of sale from Meyer in the names of First Dakota's customers, knew when Meyer would be selling particular pens of sheep and otherwise handled the paperwork associated with the transaction for First Dakota's customers.

11. First Dakota's customers could have filed a UCC-1, an Effective Financing Statement ("EFS") and a caretaker financing statement against Meyer in connection with this relationship. First Dakota knew that making these filings would put buyers of ag products on notice that when the products are sold, the buyers needed to include First Dakota's name or its customer's name on the check as a payee.

12. Neither First Dakota nor its customers ever filed a UCC-1, an EFS or a caretaker financing statement on Meyer. Instead of filing a UCC-1, an EFS and/or a caretaker financing statement on Meyer, First Dakota requested that Plainview execute a series of "acknowledgements" that First Dakota would have a first and paramount security interest in its customers' livestock at Meyer's feedlot. First Dakota drafted the acknowledgment forms.

13. When asked by the Court why a caretaker financing statement was never filed, Wayne Williamson of First Dakota testified:

> Based on the course of business, the previous involvement with the parties, level of comfort with the process in place, relative credit risk, desire of the customer. Just there's those kinds of things that would say, "yes, that's an option we could follow,

> but for these reasons we elect not to." It could have been an unsecured credit relationship.

(Trial Transcript at p. 215.)

14. Tom Deming, who has been a Senior Vice President and member of Plainview's Board of Directors for over fifteen years, served as Meyer's loan officer during Meyer's financial relationship with Plainview.

15. After First Dakota started financing the investor lambs, Grady routinely sent Deming Acknowledgment and Consent forms requesting that Plainview recognize that First Dakota had a superior security interest in its customers' lambs being fed at Meyer's feedlot. These Acknowledgment and Consent forms showed all of the livestock that First Dakota financed in the yards and put Plainview on notice of First Dakota's security interest. Plainview always signed the forms. In fact, on at least one occasion Plainview notified First Dakota that Plainview also had an interest in some lambs being fed at Meyer's operation.

16. Over the years, Plainview had significant issues with Meyer's checking account and his consistent pattern of overdrafts and check floats, causing problems with Plainview's bank regulators. Plainview's records describe Meyer as a risk taker, a bad financial manager, and as an individual who will push his credit limits beyond their established levels.

17. In the fall of 2004, Deming called Grady and told him that Meyer had paid down a large amount of his debt with Plainview and that, as a result, Plainview was writing off some of its other loans with Meyer. Deming told Grady that Meyer's equity position had increased dramatically as a result of these changes. Based on the information conveyed by Deming, Grady understood that Meyer was taking the steps necessary to get his finances in shape. Deming's news caused Grady to believe Meyer was a solid customer at Plainview.

18. During their conversation, Deming also told Grady that he no longer needed to send the Acknowledgment and Consent forms to Plainview because Plainview was no longer financing

Meyer's livestock. Despite this conversation, Grady kept sending the forms for a couple of more months until he got another call from Deming assuring him that Plainview had released its lien on Meyer's livestock.

19. Meyer had a history of negative checking account balances and overdrafts with Plainview. In just a six month period in 1999, Meyer had 17 overdrafts. Additionally, between 2001 and 2006, Plainview covered overdrafts for Meyer in excess of $10,000 on 19 separate occasions, including twice in 2001, five times in 2002, six times in 2003, once in 2004, four times in 2005 and once in 2006 just prior to the time Plainview shut down Meyer's checking account. Moreover, both Plainview's loan comments and Meyer's financial statements (which Deming prepared) reflect extensive negative checkbook balances throughout the duration of the lending relationship.

20. Due to his negative account balances, Plainview started charging Meyer an account fee of between $500 and $1,000 per quarter, which was effectively charging him interest on the negative balances.

21. Plainview was trying to move Meyer's business away from its bank as early as September of 2001. Plainview first told Meyer he had to close his checking account by December 31, 2003, then again by December 31, 2004, and again by the end of 2004. Nevertheless, Meyer never closed the account and Plainview never forced him to do so. When the Court asked Deming why the account had not been closed, his response was "I don't know for sure." Even though Meyer often lacked funds to cover checks he had written, Plainview chose to honor his checks.

22. Plainview never made First Dakota aware of its concerns about lending to Meyer's investors, Meyer's use of the proceeds from the sale of investors' livestock to finance his feed yard or Meyer's serious financial problems. Plainview never told First Dakota that it had asked Meyer to terminate his lending relationship and/or transfer his loans and deposit accounts to another financial institution. In fact, First Dakota did not learn of the large negative checking account balances or any other issues until Meyer told the investors the lambs were gone and there was no money to pay them. Grady was

"shocked" when he saw Meyer's checking account statements and realized the amount and frequency of overdrafts carried by Plainview for Meyer.

23. Plainview contends that its relationship with Meyer changed in the fall of 2004 after Meyer paid off part of his loan and it wrote off the balance. However, Meyer continued to use his checking account as a de facto line of credit. Meyer had four overdrafts in 2005 (April 28, May 27, June 23, November 21), including one in excess of $189,000. Additionally, Meyer's balance sheet, which Deming prepared, showed an actual negative checking account balance of $251,000 as of September 30, 2005. Plainview treated Meyer's checking account as more of an unsecured line of credit than a traditional deposit account.

24. During the August 2005 through January 2006 time frame, Plainview allowed Meyer to have negative checking account balances for more than the twenty-four hour window allowed by federal banking regulations, thereby effectively extending unsecured loans to Meyer. Deming admitted that Plainview did not always follow the intra day overdraft rules during this time period. Thus, Plainview effectively loaned Meyer funds to cover his overdrawn account on numerous occasions during this period.

25. Plainview allowed Meyer to overdraft his account because Meyer would communicate to Deming that he had specific checks that would be arriving for deposit, allowing Plainview to satisfy itself that the balance would again be positive within a matter of days, if not hours.

26. Deming's hands-on involvement continued throughout Plainview's relationship with Meyer, including into 2004 and 2005 when Deming physically received all of the checks from Meyer's lamb sales, completing the deposit tickets based on information faxed to him by Meyer which detailed the sales and incoming deposits. No other customer of Plainview sent Deming this type of detailed information on livestock sales and deposits.

27. Two of the slaughterhouses frequented by Meyer in 2004 and 2005 were Den Franco, Corp., in Chicago, Illinois and Swift Company, in Colorado. Meyer would typically deliver loads of sheep to Den Franco or Swift, which would then cut a check to Meyer in his name only. Meyer would then deposit these checks into his checking account at Plainview, where they would be commingled with other funds. The proceeds checks were deposited in the ordinary course of Meyer's business. The checks contained no references to any other persons who may have had an interest in the checks, nor any references to what specific lot or pen of animals had been sold to generate the checks.

28. From September of 2005 through January of 2006, Meyer continued to send nearly daily facsimiles to Deming detailing his incoming deposits from packers as well as the number of head of lambs sold. During this period lamb packer Den Franco sent the proceeds checks directly to Deming and Deming physically deposited them in Meyer's checking account. Deming admitted that he was unsure whether the proceeds of the checks from Den Franco belonged to Meyer or to someone else when Deming made the deposits into Meyer's account.

29. Based on Meyer's financial statements, which Deming completed for him, Plainview knew that by the fall of 2005 Meyer owned very few lambs of his own and had no financing to buy any new lambs. Plainview deposited checks from Meyer in Meyer's account and Meyer determined who to pay out of the account.  On days when proceeds checks representing sales of livestock owned by First Dakota's customers were deposited, there also were checks deposited that had no connection whatsoever with First Dakota or its customers.  The funds in which First Dakota claims it or its customers had an interest were a small percentage of the total amount deposited by Meyer each month.

30. First Dakota knew from the beginning of the "investor program" that Meyer was selling lambs in his own name and allowed him to deposit the funds in his Plainview checking account and make use of the funds without ever objecting to this procedure.

31. Meyer's investors were paid by Meyer writing checks on his Plainview checking account made jointly payable to First Dakota and the appropriate First Dakota customer. These checks, in turn, were deposited at First Dakota and the funds divided up between First Dakota and its customers.

32. If First Dakota or its customers had made the appropriate filings against Meyer, then the proceeds checks from the packing houses would have been written jointly to Meyer and the customers or First Dakota, which would have prevented Meyer from unilaterally depositing the checks at Plainview absent fraudulent endorsements. First Dakota admits that there were plenty of things it could have done to better protect itself from the harm that occurred in this case. For example, First Dakota and/or the investors could have required that the proceeds checks from the slaughterhouses be deposited with First Dakota, rather than at Plainview.

33. First Dakota believed that the way that Meyer did business – i.e., without any financing statements of any type filed against him – allowed him to get better contractual terms from the slaughterhouses and, in turn, to pay two dollars profit per head to First Dakota's customers who invested with him. This was the common practice among First Dakota, Plainview, Meyer and Meyer's investors for many years before the August 2005 through January 2006 time frame that is highlighted in First Dakota's Complaint.

34. Meyer ultimately was unable to pay back certain of his investors following the failure of his feedlot operation in early 2006.

35. First Dakota first suspected a problem with Meyer's operation at the end of December 2005 when Meyer's reports failed to arrive. First Dakota then noticed some of the lambs were not on the inventory sheet provided by Meyer yet had not been paid for by him. Meyer also stopped returning Grady's phone calls. At that point, Grady sent another Acknowledgment and Consent form to Plainview which had not been done in the prior months at Deming's instruction.

36. Grady and First Dakota Senior Vice-President Wayne Williamson learned of Meyer's serious financial issues at a meeting on January 20, 2006 with Meyer and First Dakota customers Schartz, Fruit and Hartman. At that time, Meyer provided First Dakota with a balance sheet which showed he owed First Dakota customers over $700,000 and had a negative checking account balance at Plainview of over a quarter million dollars. Meyer had no liquid assets to pay his bills. First Dakota had no idea of the extent of Meyer's financial problems prior to this meeting.

37. First Dakota customers Schartz, Fruit and Hartman sustained losses in excess of $630,000 as a result of Meyer selling their lambs and not paying them the proceeds. The vast majority of the lamb sales for which First Dakota's customers were not paid occurred during the last 45 days of 2005. These First Dakota customers appear to be the only individuals who Meyer failed to pay.

38. First Dakota advised its customers to immediately assume Meyer's assets and salvage what they could shortly after the January 2006 meeting because First Dakota felt at that point there might be some equity in Meyer's cattle. Because the customers could not reach consensus, they did not do anything. Instead, they ended up suing First Dakota to cancel their debts and recover their lost equity from Meyer's operation.

39. Because First Dakota wanted to control the liquidation of Meyer's assets, it quickly settled with the customers and assumed their claims. Not long after the Complaint was filed, First Dakota released all three investors from any further obligations under their notes (collectively totaling in excess of $600,000) and paid them an additional $30,000 on top of that.

40. First Dakota also reached a settlement with Meyer whereby Meyer agreed to assume responsibility for approximately $630,000 which was previously owed by the Fruits, the Shartzes and the Hartmans, but forgiven by First Dakota. Meyer also agreed to allow First Dakota to liquidate certain of his property and apply the proceeds to the debt. Meyer had roughly $300,000 of equity in cattle that disappeared due to delays in the process of liquidating Meyer's operation. After the liquidation process was completed, Meyer still owed First Dakota approximately $400,000. First

Dakota released Meyer from any further obligation so long as he agreed to pay First Dakota $36,000, interest-free, over the next ten years.

41. First Dakota acknowledges that the situation in which First Dakota now finds itself could have been easily avoided had First Dakota or its customers simply filed the appropriate financing statements on Tom Meyer. Following the losses in connection with the Meyer relationship, First Dakota revised its ag lending practices to give it greater security when making ag loans.

## CONCLUSIONS OF LAW

1. "Conversion is the act of exercising control or dominion over personal property in a manner that repudiates the owner's right in the property or in a manner that is inconsistent with such a right." *Wyman v. Terry Schulte Chevrolet, Inc.*, 584 N.W.2d 103, 107 (S.D. 1998) (citation omitted). In order to prevail on a claim of conversion First Dakota must prove: (1) First Dakota owned or had a possessory interest in the proceeds; (2) First Dakota's interest in the proceeds was greater than Plainview's interest; (3) Plainview exercised dominion or control over or seriously interfered with First Dakota's interest in the proceeds; and (4) such conduct deprived First Dakota of its interest in the proceeds. *First Am. Bank & Trust N.A. v. Farmers State Bank,* 756 N.W.2d 19, 31 (S.D. 2008) (citing SD Pattern Jury Instructions (Civil) 170-30-2).

2. It is undisputed that First Dakota had a possessory interest in the proceeds from sales of its customer's sheep.

3. It is undisputed that both First Dakota and its customers failed to perfect a security interest in the livestock or the proceeds from sales of the livestock.

4. Many courts in numerous jurisdictions have held that when a bank voluntarily pays a check as an overdraft, it makes a loan to its customers. *See Tony's Tortilla Factory v. First Bank*, 857 S.W.2d 580, 584-85 (Tex. App. 1993) (collecting many cases), *aff'd in part, rev'd in part on other grounds*,

*First Bank v. Tony's Tortilla Factory, Inc.*, 877 S.W.2d 285 (Tex. 1994); *see also In re Frigitemp Corp.*, 34 B.R. 1000, 1019-1020 (Bankr. S.D.N.Y. 1983) (acknowledging that repeated overdrafts covered by a bank are the equivalent of short term loans). Plainview's CEO, Dean Harrington, testified that the bank considered a negative account balance as an unsecured loan. (Trial Transcript at p. 201-202.) Plainview used Meyer's deposits to offset its unsecured debt by covering his checks, and even charged Meyer a quarterly fee for this practice. It is the Court's conclusion that the repeated overdrafts and negative balances covered by Plainview were the equivalent of unsecured loans to Meyer. The Court also concludes that Plainview exercised set-offs by applying deposits from Meyer's account to cover overdrafts and rectify negative balances. *See, e.g., S. Kane & Son Profit Sharing Trust v. Marine Midland Bank*, 1996 WL 325894 at *4, *7 (E.D. Pa. June 13, 1996) (treating as a setoff the amount used by bank to cover overdraft in customer's account, and holding that bank was entitled to recover that money and lawfully took it from customer's operating account); *Frigitemp*, 34 B.R. at 1019 (customer's deposits which bank used to pay down the customer's overdraft debt were set-offs).

5. In most jurisdictions, the Uniform Commercial Code (UCC) is viewed as superseding state common law relevant to the right of set-off, and South Dakota is in the majority. *See Consolidated Nutrition, L.C. v. IBP, Inc.*, 669 N.W.2d 126 (S.D. 2003) (adopting majority view that priority scheme of Article 9 dictates the analysis to be applied in deciding the priority between a security interest and a set-off in the same collateral); *Rushmore State Bank v. Kurylas, Inc.*, 424 N.W.2d 649 (S.D. 1988) (South Dakota Supreme Court looked to Article 9 of the UCC to determine which party had priority in the collateral for purposes of deciding whether the defendant converted the collateral). The Eighth Circuit has recognized that Article 9 of the UCC rather than the common law governs the priority between the right of set-off and a perfected security interest. *See In re Apex Oil Co.*, 975 F.2d 1365 (8th Cir. 1992) (applying Texas law).[1] Prior to discovering these South Dakota cases

[1]In *Apex*, the Eighth Circuit held that, where millions of dollars are at stake, a company acts unreasonably if it sets off a debt to it from another transaction after being given notice of another's security interest in the amount due. *See In re Apex*, 975 F.2d at 1370. As explained below, however, subsequent revisions made to Article 9 of South Dakota's UCC in 2000 now allow a bank to set off a debt even when it has notice of another's security interest. Assuming Texas has adopted Revised

through its own research, this Court believed South Dakota common law applied to the priority dispute in this case. That belief that South Dakota common law applied was part of the basis for the Court's letter to the parties dated July 6, 2010. The Court now concludes that it must look to Article 9 of South Dakota's UCC to determine whether First Dakota's interest in the proceeds was greater than Plainview's interest, the second element of First Dakota's conversion claim. See SDCL § 57A-9-109(d)(10)(2000) ("Section 57A-9-340 applies with respect to the effectiveness of rights of recoupment or set-off against deposit accounts.")

6. The UCC was adopted by the South Dakota legislature as Chapter 150 of the 1966 Session Laws. *See Johnson v. John Deere Co.*, 306 N.W.2d 231, 232 (S.D. 1981). It was incorporated into the Compiled Laws of 1967 as Chapter 57. *See id.* In the 1980 revision of Title 57, the code commission transferred the sections in Title 57 to new Title 57A and renumbered the sections to correspond with the official UCC text. *See id.* Over the years, numerous revisions have been made to Title 57A. Relevant in the present case, a major revision of Article 9 governing secured transactions was enacted into law in South Dakota in 2000.

7. The Court concludes that SDCL §§ 57A-9-340 and 57A-9-341 govern this priority dispute. *See* SDCL § 57A-9-109(d)(10); *Kentucky Highlands Investment Corp. v. Bank of Corbin, Inc.*, 217 S.W.3d 851 (Ky. App. 2006) (applying same sections of Kentucky UCC to determine bank had priority set-off right to funds in deposit account); *cf. General Electric Capital Corp. v. Union Planters Bank, N.A.*, 409 F.3d 1049 (8th Cir. 2005) (applying pre-revision Article 9 of Missouri UCC to determine priority of interests in funds swept from account by bank). These UCC provisions govern the rights of a bank with respect to deposit accounts.[2]

---

Article 9, the result in *Apex* likely would be different today.

[2]SDCL §§ 57A-9-340 and 57A-9-341 did not exist when this Court issued its opinion in *Meyer v. Norwest Bank Iowa, Nat. Ass'n*, 924 F. Supp. 964, 968 n.2 (D.S.D. 1996) (discussing South Dakota's common law "equitable" rule regarding bank's right of setoff, and noting that the South Dakota courts had not ruled that the equitable rule was superseded by the UCC), *rev'd on other grounds*, 112 F.3d 946 (8th Cir. 1997). Since the *Meyer* decision in 1996, the South Dakota legislature adopted Revised Article 9 of the UCC and, in the 2003 *Consolidated Nutrition* decision,

8. SDCL § 57A-9-340 provides:

> (a) Except as otherwise provided in subsection (c), a bank with which a deposit account is maintained may exercise any right of recoupment or set-off against a secured party that holds a security interest in the deposit account.
>
> (b) Except as otherwise provided in subsection (c), the application of this article to a security interest in a deposit account does not affect a right of recoupment or set-off of the secured party as to a deposit account maintained with the secured party.
>
> (c) The exercise by a bank of a set-off against a deposit account is ineffective against a secured party that holds a security interest in the deposit account which is perfected by control under § 57A-9-104(a)(3), if the set-off is based on a claim against the debtor.

SDCL § 57A-9-340. This provision places a bank's right of set-off ahead of the security interest of a secured party in the deposit account. A secured party's interest in the account will be subordinate until the security interest in the deposit is perfected "by control under § 57A-9-104(a)(3)."[3] There is no dispute that neither First Dakota nor its customers took control of Myer's account or perfected a security interest in the account. Thus Plainview's right of set-off is superior to First Dakota's interest in the proceeds in Meyer's account.

9. SDCL § 57A-9-341 provides:

> Except as otherwise provided in § 57A-9-340(c), and unless the bank otherwise agrees in an authenticated record, a bank's rights and duties with respect to a deposit account maintained with the bank are not terminated, suspended, or modified by:
>
> (1) The creation, attachment, or perfection of a security interest in the deposit account;
>
> (2) The bank's knowledge of the security interest; or
>
> (3) The bank's receipt of instructions from the secured party.

---

the South Dakota Supreme Court held that the priority scheme of Article 9 dictates the analysis to be applied in deciding the priority between a security interest and a set-off in the same collateral.

[3]The secured party has control over an account by becoming the bank's customer on the deposit account. *See* SDCL § 57A-9-104(a)(3).

SDCL § 57A-9-341. As explained in LAWRENCE'S ANDERSON ON THE UNIFORM COMMERCIAL CODE (3rd ed.) § 9-341:4 [Rev], this section of the UCC provides that a bank's rights and duties with respect to a deposit account maintained with the bank are not altered in any way by the debtor granting a security interest in the account to another party. *See* SDCL § 57A-9-341(1) and Official Comment 2. The bank may continue to follow its customer's instructions by, for example, honoring checks or allowing withdrawals and otherwise treating the account as belonging solely to the customer. *See* SDCL § 57A-9-341 and Official Comment 3. The bank's rights and duties are not changed whether or not the security interest has attached or is perfected. *See* SDCL § 57A-9-341(1) and Official Comment 2. The only exception is if the deposit account security interest has been perfected by control. *See* SDCL 57A-9-340(c). It does not matter that the bank knows of the security interest or even is in receipt of instructions from the secured party. *See* SDCL § 57A-9-341(2), (3) and Official Comment 2. Thus the fact that Plainview knew First Dakota and its customers had a security interest in some of the sheep sold by Meyer does not alter Plainview's right to off-set money in Meyer's account.

10. One purpose of revised Article 9 is to ensure that security interests in cash proceeds and deposit accounts do not impede the flow of funds in the banking system.

> **Free Flow of Funds.** This section is designed to prevent security interests in deposit accounts from impeding the free flow of funds through the payment system. Subject to two exceptions, it leaves the bank's rights and duties with respect to the deposit account and the funds on deposit unaffected by the creation or perfection of a security interest or by the bank's knowledge of the security interest. In addition, the section permits the bank to ignore the instructions of the secured party unless it had agreed to honor them or unless other law provides to the contrary. A secured party who wishes to deprive the debtor of access to funds on deposit or to appropriate those funds for itself needs to obtain the agreement of the bank, utilize the judicial process, or comply with procedures set forth in other law. Section 4-303(a), concerning the effect of notice on a bank's right and duty to pay items, is not to the contrary. That section addresses only whether an otherwise effective notice comes too late; it does not determine whether a timely notice is otherwise effective.

SDCL § 57A-9-341, Official Comment 2.

11. Under South Dakota UCC law, Plainview's set-off right prevails over First Dakota's interest in the proceeds in Meyer's account, and Plainview properly exercised its right of set-off against the proceeds.

12. First Dakota has failed to prove the second element of its conversion claim. Plainview did not convert any monies in which First Dakota or its customers had a superior interest.

13. The Court rejects First Dakota's initial argument that its interest is superior because the deposits into Meyer's account were special deposits. First, the Court has determined that this dispute between First Dakota and Plainview involves determining the parties' priority interests pursuant to the relevant sections of South Dakota's UCC rather than pursuant to the common law. First Dakota came to this conclusion in its brief filed on July 11, 2011, where it states that both South Dakota and Minnesota "now expressly address the priority of setoffs in the context of revised Article 9." (Doc. 50 at p. 5.) Second, even if the common law of special deposits applied in this case, the facts developed at trial do not support a finding that Meyer's deposits were special deposits. This essentially was admitted by First Dakota's President, Wayne Williamson, when he testified that Tom Meyer deposited the sale proceeds checks in his Plainview account in the ordinary course of his business. (*See* Trial Transcript at p. 218-219.) First Dakota knew from the beginning that Meyer would be depositing checks into his account and that Plainview was free to accept the checks for deposit without asking First Dakota or its customers. *See id.* Under the facts and circumstances of this case, the special deposit rule is inapplicable.

14. The Court concludes that the Acknowledgment Forms do not waive Plainview's priority right to payments from the deposits made in Meyer's account. *See Union Planters Bank*, 409 F.3d at 1057-58 (subordination agreement recognized superiority of creditor's security interest in the inventory it financed, but subordination agreement did not preclude bank from sweeping debtor's money out of account to pay a debt owed to bank even if the bank knew proceeds of creditor-financed inventory had been deposited in the account). As explained above, under South Dakota's

UCC, even if Plainview knew about First Dakota's security interest in the collateral, Plainview's right of set-off prevails over First Dakota's security interest.

15. The Court rejects First Dakota's argument that the Acknowledgment Forms signed by Plainview amount to an agreement (in an authenticated record) by Plainview not to exercise a set-off of Meyer's deposit account. This argument stems from SDCL § 57A-9-341, which provides:

> Except as otherwise provided in § 57A-9-340(c), and unless the bank otherwise agrees in an authenticated record, a bank's rights and duties with respect to a deposit account maintained with the bank are not terminated, suspended, or modified by:
>
> (1) The creation, attachment, or perfection of a security interest in the deposit account;
>
> (2) The bank's knowledge of the security interest; or
>
> (3) The bank's receipt of instructions from the secured party.

*See* SDCL § 57A-9-341 (emphasis added). The Acknowledgment Forms simply state that First Dakota has a security interest in certain livestock placed with Meyer, owned by First Dakota customers, based upon loans made to the customers by First Dakota, and there is no evidence that either First Dakota or Plainview intended the Acknowledgment Forms to be an agreement by Plainview not to set-off Meyer's account. When First Dakota's witness, Jeremy Grady, was asked about the purpose of the Acknowledgment Forms, he said, "Just puts First National Bank of Plainview on notice that First Dakota has placed livestock with their customer, Tom Meyer, and that we will maintain a first and paramount security interest in that livestock." (Trial Transcript at p. 25.) Because one purpose of Article 9 is to shield depository banks from claims and priority disputes with secured creditors, it is the Court's opinion that a bank's agreement to subordinate its set-off rights to a secured creditor must be clear. The Acknowledgment Forms in this case cannot be interpreted as an agreement by Plainview not to set-off Meyer's deposit account.

16. The Court rejects First Dakota's argument that Plainview lost its priority position with regard to the money in Meyer's deposit account because Plainview colluded with Meyer to undermine First Dakota's interest in the money. First Dakota relies on section 9-332(b) of the UCC (or SDCL §

57A-9-332), which provides, "A transferee of funds from a deposit account takes the funds free of a security interest in the deposit account unless the transferee acts in collusion with the debtor in violating the rights of the secured party." The statute does not define "transferee." According to LAWRENCE'S ANDERSON ON THE UNIFORM COMMERCIAL CODE, a depository bank is not a transferee:

> UCC § 9-332, which is intended to provide broad protection for transferees of funds from a deposit account representing the proceeds of a secured creditor's collateral, does not pertain to priority conflicts between a depository bank and a secured creditor concerning funds in the deposit account. A depository bank is not a transferee as described by the language of the statute. Thus, in a priority dispute between a primary lender and a depository bank in which the bank claimed a right of setoff against funds in a commercial deposit account and the primary lender asserted a perfected security interest in the same funds, the primary lender's assertion that the depository bank and debtor colluded to deprive it of the value of its collateral was without merit.

LAWRENCE'S ANDERSON ON THE UNIFORM COMMERCIAL CODE (3rd ed.) § 9-332:3 [Rev]. *See also Kentucky Highlands Inv. Corp. v. Bank of Corbin, Inc.*, 217 S.W.3d 851 (Ky. Ct. App. 2006) (bank's right of setoff trumps a secured lender's "identifiable proceeds" claim to the deposit account under UCC 9-340, and a bank exercising setoff is not a "transferee" subject to the "collusion" principle under UCC 9-332).

Furthermore, the official commentary to § 9-332 states that the section "sets forth the circumstances under which certain transferees of money or funds take free of security interest. It does not determine the rights of a transferee who does not take free of a security interest." Thus, even if Plainview met the definition of "transferee," § 9-332 does not determine priority. As stated above in paragraph 8, Plainview's setoff rights have priority because neither First Dakota nor its customers took control of Meyer's deposit account.

17. "[Unjust enrichment] occurs when one confers a benefit upon another who accepts or acquiesces in that benefit, making it inequitable to retain that benefit without paying." *Mack v. Mack*, 613 N.W.2d 64, 69 (S.D. 2000) (quoting *Parker v. W. Dakota Insurors, Inc.*, 605 N.W.2d 181, 187 (S.D. 2000)) (citation omitted). "When unjust enrichment is found, the law implies a contract, which

requires the defendant to compensate the plaintiff for the value of the benefit conferred." *Id.* In order to state a claim of unjust enrichment, a plaintiff must allege facts showing that: "(1) a benefit was received; (2) the recipient was cognizant of that benefit; and (3) the retention of the benefit without reimbursement would unjustly enrich the recipient." *Id.*

18. As discussed above, the Acknowledgment forms were not enough to give First Dakota or its customers priority over the funds in Meyer's account. Thus, the fact that Plainview told First Dakota not to send the Acknowledgment forms does not support the unjust enrichment claim. Furthermore, there is no evidence that Plainview's intention was to mislead First Dakota or to somehow interfere with its rights when Plainview told First Dakota the Acknowledgment forms were unnecessary. First Dakota witnesses admitted at trial that it and its customers could have perfected their security interest, and could have taken a number of other steps to protect their interest in the proceeds from the sale of their livestock placed with Meyer. They chose not to do so. First Dakota, itself a bank, was not vigilant in protecting its rights. Plainview had a right to set-off the money in Meyer's deposit account, and the Court concludes that Plainview was not unjustly enriched.

19. Plainview did not breach any contract, express or implied, between it and First Dakota.

**CONCLUSION**

Based upon the Court's findings of fact and conclusions of law set forth above, the Court finds for the Defendant on Plaintiff's claims. Accordingly,

> IT IS ORDERED that the Court finds in favor of Defendant, First National Bank of Plainview, and against Plaintiff, First Dakota National Bank, on all of Plaintiff's claims in this action.

Dated this 19th day of September, 2011.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: ______________________
(SEAL) DEPUTY